**Shirley MAYHEW, et al.**

v.

**Walter COHEN, et al.**

**Civ. A. No. 84–3963.**

United States District Court,
E.D. Pennsylvania.

Dec. 21, 1984.

Catherine C. Carr, Community Legal Services, Inc., Philadelphia, Pa., for plaintiffs.

John G. Knorr, III, Deputy Atty. Gen., Harrisburg, Pa., for defendants.

MEMORANDUM

LOUIS H. POLLAK, District Judge.

In this action, plaintiffs, recipients of federal or state welfare assistance who reside in the Philadelphia area, challenge the process by which the state Department of Public Welfare ("DPW") recoups alleged benefit overpayments. Specifically, plaintiffs contend that the series of three letters through which the state informs affected individuals about the recoupment process

do not provide constitutionally sufficient notice of (1) what DPW seeks and why, and (2) what steps a welfare recipient should take to address DPW's claims. Plaintiffs seek to enjoin the state from proceeding with recoupment based on that allegedly insufficient notice. An evidentiary hearing was held on plaintiffs' motion for a preliminary injunction on November 26–27, 1984. In addition, the parties have submitted extensive briefs on the question whether the notice satisfies constitutional requirements.

On December 19, 1984, I issued an Order on the three motions outstanding in this case: plaintiffs' motion to amend, plaintiffs' motion for class certification, and plaintiffs' motion for a preliminary injunction. The motion to amend was granted as unopposed. The following discussion explains my rulings on the class certification and preliminary injunction motions. I will begin by summarizing the relevant facts, and will then proceed to consider plaintiffs' motions.

## I. STATEMENT OF FACTS

Under the Omnibus Budget Reconciliation Act of 1981, states are required to make some provision for the recoupment of overpayments of AFDC benefits. 42 U.S.C. § 602(a)(22). *See also* 45 C.F.R. § 233.20(a)(13) (regulations promulgated by the Secretary of Health and Human Services implementing the statute). By way of complying with this statute, the DPW has promulgated regulations which outline the procedure to be followed in recouping overpayments. *See* 55 Pa.Code § 255.1 *et seq.* These procedures are applied to overpayments both of federally funded AFDC benefits and of state funded General Assistance ("GA") benefits. In addition, the overpayments themselves may be the result of any of a number of factors, ranging from the recipient's failure to report income to the state's own administrative error.

Neither state nor federal regulations prescribe a specific notice form for use in the recoupment program. The state has adopted such a form as a matter of administrative practice, however.

The state's practice has been to send three letters to those recipients determined, as a preliminary matter, to have received overpayments. These three letters are reproduced as appendices to this Opinion. The first letter (Appendix A) (1) tells the recipient that he has received an overpayment and the amount of the alleged overpayment, and (2) provides a form on which the recipient may specify any of three methods of repayment. (The three methods are payment of the full amount at once, partial payment combined with a 10% reduction in the recipient's benefit checks until the full debt is repaid, and the 10% benefit reduction alone.) The letter states that if the recipient does not respond within fourteen days, the state will automatically select the 10% benefit reduction as the method of repayment. Below the form on which the recipient is to choose his method of repayment, the letter states that "[y]ou will have the opportunity to request an appeal and to have a fair hearing when you receive your advance notice notifying you when recoupment will start."

The second letter (Appendix B) arrives approximately three weeks after the first. The second is shorter than the first, and states simply that the recipient's check will be reduced by a stated amount until the overpayment is fully recouped. The second letter also states that one additional notice will be forthcoming and will provide additional information regarding both the benefit reduction and the recipient's hearing rights:

Shortly you will receive an advance notice that your check will be reduced. The advance notice form will inform you of the semi-monthly recoupment amount and the date of the check that grant reduction will begin. When you receive the advance notice form, you have the right to request an appeal and a fair hearing.

The third letter (Appendix C), which the parties agree arrives in the same envelope as the second, begins by restating the fact

and amount of the overpayment and the amount by which the recipient's benefits will be reduced in order to repay it. Then, under the heading "YOUR RIGHT TO APPEAL AND TO A FAIR HEARING," the letter states that if the recipient disagrees with the state's decision the recipient may appeal, and goes on to describe how to request such an appeal. At the bottom of the letter is a form for that purpose, which must be signed and mailed in to the Bureau of Claim Settlement. The form asks the recipient to state his name, address, telephone number, and the reason for his appeal. None of the three letters states either the cause of the overpayment or how the amount of the overpayment was calculated.

At the hearing held November 26–27, 1984, plaintiffs introduced evidence tending to show a substantial possibility of error in those calculations, stemming largely from the detailed regulations which govern the calculation of the recipient's income, which in turn determines the level of benefits for which the recipient is eligible. Defendants did not deny the fact that such error occasionally occurred, focusing instead on the costliness of providing more detailed notice.

Plaintiffs allege that the notice used in the state's recoupment program is constitutionally inadequate, in that it fails adequately to advise recipients of their hearing rights, and, as to those plaintiffs who requested hearings, fails to give them sufficient information to prepare for their appeals. Named plaintiffs include individuals at all stages of the recoupment process.

## II. MOTION FOR CLASS CERTIFICATION

■ Named plaintiffs seek to represent a class which they define as follows:

All AFDC and GA recipients in the Commonwealth of Pennsylvania who

(a) have received one or more assistance overpayment recoupment notices and who have recoupment claims pending against them but have not yet had any checks reduced to recoup an overpayment;

(b) have received assistance overpayment recoupment notices and who have had one or more checks reduced to recoup the alleged past overpayment;

(c) have not yet received assistance overpayment recoupment notices, but will in the future.

Plaintiffs' Modified Class Definition at 1–2.[1] Defendants do not oppose certification.[2]

In order to obtain certification for their proposed class, plaintiffs must satisfy the court that they can represent the proposed

---

**1.** Plaintiffs initially submitted a somewhat different class definition. *See* Plaintiffs' Motion for Class Certification. For reasons stated on the record on November 26, 1984, I found this initial definition unclear, and ordered the parties to undertake to reach agreement on a modified class definition; the resultant revision is the proposed class definition I consider in this Memorandum.

Plaintiffs also seek certification of a sub-class defined to exclude only AFDC recipients, but which is identical in all other respects to the class. Plaintiffs' Modified Class Definition at 2. Plaintiffs do not explain how the interests of class members who are AFDC recipients differ from the interests of other class members. Accordingly, I decline to certify the proposed sub-class at this time.

**2.** Defendants object only to the absence of a specific statement that class members seek injunctive and declaratory relief and not money damages. Defendants contend that, under *Edel-*

man v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), plaintiffs may not recover damages in any event. Further, defendants argue that a damage award would be inconsistent with Federal Rule of Civil Procedure 23(b)(2), under which plaintiffs seek class certification. To the extent defendants maintain that any money award would violate Rule 23(b)(2), they are in error. *See Christy v. Hammel,* 87 F.R.D. 381, 393 n. 26 (M.D.Pa.1980) (court may certify class action on injunction issue and treat damages claim as incidental); *Anderson v. Rizzo,* 80 F.R.D. 72, 75 n. 6 (E.D.Pa.1978) (actions in which classwide declaratory or injunctive relief is sought may be maintained under 23(b)(2) even though damages are also sought); 7A C. Wright & A. Miller, *Federal Practice and Procedure: Civil 2d* § 1775, at 22–23.

Defendants' Eleventh Amendment argument is more substantial, but that argument is more properly addressed to the remedies which ought to be provided than to class certification.

class in accordance with the requirements of Rules 23(a) and 23(b)(2). Rule 23(a) states:

> *Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Under Rule 23(b)(2), a class action may be maintained if it satisfies these four criteria *and* if:

> the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

Fed.R.Civ.P. 23(b)(2).

■ Turning first to the four requirements of Rule 23(a), it appears that the first two—numerousness of the class and the existence of common questions of law or fact—are self-evidently satisfied here. The class which plaintiffs seek to represent includes all AFDC and GA recipients in Pennsylvania who have in the past been, or will in the future be, subject to or threatened with a reduction of their assistance benefits because of an alleged past overpayment of such benefits. Defendants, in their Answer, acknowledged that the class numbered in the thousands and that joinder was therefore impracticable. As to the common questions criterion of 23(a)(2), plaintiffs assert that the notice used in the recoupment process is inadequate. This claim is one which all those who have received—or, indeed, may receive—such notice would share.

The third and fourth requirements look to whether the named representatives are able properly to represent the interests of the proposed class. Named plaintiffs meet this test also. In particular, the named plaintiffs include individuals at each possible stage of the recoupment process. *See* Amended Complaint at ¶¶ 21–105. Thus, named plaintiffs represent the full range of interests of those who have received or will receive the notice challenged here.

The greatest potential for adverseness of interest, and the greatest cause for hesitation in certifying the proposed class, lies in the potential conflict between (1) welfare recipients who claim that the notice prevented them from preparing adequately for their hearing, and (2) welfare recipients who, for whatever reason,[3] have not yet received a hearing on their alleged overpayment. These two categories of plaintiffs share the contention that the state's notice was constitutionally defective; however, the different consequences of the defective notice may lead to different legal results for those who have had hearings than for those who have not.[4] This problem is, in my view, resolved by the fact that the named plaintiffs include (1) recipients who have had a hearing for which they allegedly could not prepare adequately (e.g., Deborah Lebron), (2) recipients who have not yet had a hearing but have one

---

**3.** Recipients who have not had hearings on their alleged overpayments fall into two categories: those for whom the time for a hearing has not yet arrived, *e.g.,* Amended Complaint at ¶¶ 43–49 (named plaintiff Kathleen Westerfer), and those who failed to timely request a hearing. *E.g.,* Amended Complaint at ¶¶ 68–81 (named plaintiff Leonard Pickens).

**4.** Plaintiffs claim that the notice was defective both for failing adequately to inform recipients of their hearing rights, and for failing to provide enough information for recipients to prepare for their appeals. Only the second of these claims applies to recipients who have had hearings. Moreover, a recipient's inability to prepare adequately for his hearing may or may not have prejudiced him at the hearing. It is possible, for instance, that some recipients, on arriving at the hearing, received answers to their questions about the alleged overpayment and realized that they had no grounds for challenging the state's action. Such persons may stand on different legal footing than those who were deterred from ever requesting a hearing because of the confusing nature of the state's notice letters.

scheduled (e.g., Shirley Mayhew), and (3) a recipient (Leonard Pickens) who had no hearing because he allegedly could not understand the notice and therefore did not request a hearing in time. *See* Amended Complaint ¶¶ 30, 39, 78–80.

The Rule 23(b)(2) requirement that the opposing party have acted "on grounds generally applicable to the class" is satisfied by the very nature of plaintiffs' claim. The proposed class includes all who have received or will receive the set of notices challenged as constitutionally inadequate. As to all such parties, the government has "acted"—sent the notices (or is prepared to send the notices)—in a common fashion for a common purpose.

Accordingly, I will grant plaintiffs' motion for class certification, reserving the option of either revising the definition of the class or certifying sub-classes under Rule 23(c) should such changes become necessary at a later stage of the litigation.

## III. MOTION FOR PRELIMINARY INJUNCTION

■ The parties do not dispute the standard I must apply in deciding whether to grant plaintiffs' motion for preliminary injunctive relief. Plaintiffs must show (1) a reasonable probability of success on the merits and (2) irreparable harm if relief is withheld until the conclusion of the litigation; in addition, I must consider (3) the harm which the requested relief will cause the government and (4) the public interest. *Oburn v. Shapp*, 521 F.2d 142 (3d Cir. 1975); *Hill v. O'Bannon*, 554 F.Supp. 190, 194 (E.D.Pa.1982). A discussion of how these factors apply in this case follows.

### A. *Probability of Success on the Merits*

■ The parties (correctly) agree that the recoupment program implicates a property interest under the Fourteenth Amendment. *Mattern v. Mathews*, 582 F.2d 248, 254 (3d Cir.1978), *cert. denied*, 443 U.S. 912, 99 S.Ct. 3101, 61 L.Ed.2d 876 (1979). *See Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893,

901, 47 L.Ed.2d 18 (1976). The dispute therefore centers on the adequacy of the process by which plaintiffs' Fourteenth Amendment "property" has been, or is in danger of being, "denied." Specifically, plaintiffs contend that the series of three letters by which the state notifies a recipient of an overpayment and its consequences offers inadequate notice of (1) the nature and scope of the recipient's right to contest the recoupment, and (2) the reasons for the government's action.

I derive the standard by which the state's notice must be judged from *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978). In *Memphis Light*, the Supreme Court held that a municipal utility could not terminate service without providing notice designed to inform the terminated customer of the means by which he could contest the termination. 436 U.S. at 14–15, 98 S.Ct. at 1562–1563. The Court began its discussion of the notice issue by quoting the standard used in *Mullane v. Hanover Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950):

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.

*Mullane, supra*, 339 U.S. at 314, 70 S.Ct. at 657 (quoted in *Memphis Light, supra*, 436 U.S. at 13, 98 S.Ct. at 1562). Because the "notice" given in *Memphis Light* —a statement that payment was overdue and service would be terminated if it was not forthcoming—gave *no* information about how one could appeal the termination, the Court found it inadequate. *Memphis Light*, 436 U.S. at 14–15, 98 S.Ct. at 1562–1563. Such notice, the Court reasoned, could not possibly achieve the twin purposes of notice under the due process clause: "to apprise the affected individual of, and permit adequate preparation for, an

impending 'hearing.' " *Id.* at 14, 98 S.Ct. at 1562.

■ *Memphis Light* suggests that constitutionally adequate notice (1) must be reasonably calculated to inform recipients of the availability of a hearing, and (2) must offer recipients the opportunity to prepare adequately for that hearing. *See also Mennonite Board of Missions v. Adams,* 462 U.S. 791, 103 S.Ct. 2706, 2712, 77 L.Ed.2d 180 (1983); *Landon v. Plasencia,* 459 U.S. 21, 103 S.Ct. 321, 331, 74 L.Ed.2d 21 (1982); *Wolff v. McDonnell,* 418 U.S. 539, 564, 94 S.Ct. 2963, 2978, 41 L.Ed.2d 935 (1974). These broad principles will necessarily yield different notice processes in different circumstances, as the following discussion in *Memphis Light* shows:

The Crafts were told that unless the double bills were paid by a certain date their electricity would be cut off. But—as the Court of Appeals held—this skeletal notice did not advise them of a procedure for challenging disputed bills. Such notice may well have been adequate under different circumstances. Here, however, the notice is given to thousands of customers of various levels of education, experience, and resources. Lay consumers of electric service, the uninterrupted continuity of which is essential to health and safety, should be informed clearly of the availability of an opportunity to present their complaint. In essence, recipients of a cutoff notice should be told where, during which hours of the day, and before whom disputed bills appropriately may be considered.

436 U.S. at 14–15 n. 15, 98 S.Ct. at 1562–1563 n. 15. Whatever particular form the notice takes, however, the state must inform affected parties in such a manner that the hearing process is effective. Hence the Court's two-pronged definition of notice's purpose, covering both knowledge of the existence of a hearing and the opportunity to prepare so that the hearing might be meaningful.[5]

### 1. Notice of the Availability of a Hearing

Each of the three notification letters states that the recipient has the right to an appeal and a fair hearing. The first of the letters (Appendix A), however, refers to this right in a single sentence at the bottom of the form on which the recipient is invited to check the preferred means of recoupment. The body of the first letter—the portion above the repayment form—never mentions the availability of a hearing. Instead, the letter gives the distinct impression that the state's determination is final. It uses mandatory language—"you must repay," "if you do not return the bottom portion of this notice, Claims Settlement will use Option C automatically"—which suggests that the only open question is the method, not the fact, of recoupment. Nor does the provision of a toll-free number to call for questions offer much help: the reader of the letter might plausibly assume that the questions referred to concern the three methods of repayment. Finally, when at the bottom of the form the letter does mention the recipient's right to appeal, it is unclear whether benefits will

---

**5.** The parties address these concerns in terms of the balancing test applied in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). A number of judicial decisions also apply *Mathews'* balance of private and public interests and the risk of adjudicatory error to notice questions like the one presented here. *See, e.g., Foggs v. Block,* 722 F.2d 933, 938 (1st Cir.1983), *cert. granted sub nom. Atkins v. Parker,* —— U.S. ——, 104 S.Ct. 3532, 82 L.Ed.2d 838 (1984); *Hill v. O'Bannon,* 554 F.Supp. 190, 196–97 (E.D.Pa.1982); *Philadelphia Welfare Rights Organization v. O'Bannon,* 525 F.Supp. 1055, 1058–61 (E.D.Pa.1981). I do not disagree with the approach these courts have taken, for I find that the *Mathews* balance must in any event

yield a formula identical to the one suggested by *Memphis Light.* In particular, notice which does not, in a meaningful way, inform affected parties of their hearing rights creates an enormous risk of adjudicatory error: notice, after all, is antecedent to any adjudication at all. *See Mennonite Board of Missions v. Adams,* 462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983). Thus, whether (1) *Memphis Light* states a separate standard for notice cases or (2) *Memphis Light* is an example of how *Mathews'* formula works in notice cases, one reaches the same destination: notice must both tell recipients of their hearing rights and allow them meaningfully to exercise those rights.

continue to be paid while the recipient appeals. Nothing in the letter itself would lead the recipient to conclude that the hearing to be offered is pre- rather than post-reduction.

The second letter (Appendix B) is only marginally more informative. It states that the recipient's benefits will be reduced and by what amount, and then recites that when an "advance notice form" is received, the recipient may request a hearing. The letter does not say when or where the hearing will take place, or how to request it, implying that such information will be received "shortly," when the advance notice form arrives.

The third letter (Appendix C), which arrives together with the second and not afterward as the second letter suggests, explains the appeal process in much greater detail, stating both when and how to request a hearing in the event that the recipient wishes to challenge recoupment.

Defendants contend that the letters fulfill their obligation to inform recipients of their appeal rights, for two reasons. First, defendants argue that each of the letters expressly states that the recipient has a right to a "fair hearing" if he objects to the state's overpayment decision. Second, defendants note that the third letter explains in detail how and when that hearing may be requested. Both arguments are strong, but they do not address the letters' critical deficiencies. The third letter tells recipients that "[i]f you disagree with our decision, you have the right to appeal and a fair hearing." That promise is, however, empty if the recipient cannot possibly know whether he "disagrees" with the state's decision. It is difficult to imagine how the recipient, knowing only that his checks are to be reduced and by how much, is to decide whether the state has made a mistake or not. The state compounds this problem by requiring the recipient, on the hearing request form, to "state the reason for your appeal." This appears to ask the impossible, given that the recipient is not told the "reason" for the initial determination.

In addition, the letters in some respects provide too much in the way of information which may mislead when taken out of the context of the recipient's rights. Thus, the state invites recipients to pay all or part of their claim right away, in the form at the bottom of the first letter. Such payments must be rare, and none of the named plaintiffs alleges that he or she paid in this manner, but those who do are unquestionably paying the state before being notified that they have a right to a pre-reduction hearing. Moreover, even as to those who do not pay upon receipt of the first two notices, those early notices may have a confusing or intimidating effect that deters a recipient from pursuing appeal rights as purposefully as if the recipient had gotten one notice which fully informed him of his status.

■ Constitutionally adequate notice must not only contain the necessary minimum amount of relevant data, it must also not mislead its recipient about that data's significance. *Jackson v. O'Bannon,* CCH Medicare and Medicaid Guide ¶ 31,108 (E.D. Pa.1980). Useful information may be drowned out by either superfluous or premature disclosures. *Id.*

■ There is a reasonable probability that such is the case with regard to the three notices at issue here. I know of no good reason (and defendants have offered none) which justifies the sequence of forms described above. Moreover, the confusion engendered by multiple (and somewhat inconsistent, at least in emphasis) notices can be remedied at no great expense to the state. Indeed, combining notice forms would, one might suppose, actually save the state money. Defendants are therefore in a poor position to argue that the confusing form of notice they now employ is necessary as a matter of administrative convenience. For these reasons, I find it reasonably probable that plaintiffs will succeed on their argument that the notices inadequately inform recipients of their right to a hearing.

### 2. *Adequacy of Recipients' Opportunity to Prepare*

The parties have largely framed the issue in this case as whether or not the state must, in the notice forms, explain in detail the reasons for its overpayment determination. A series of decisions by the Court of Appeals for the Seventh Circuit hold that a statement of reasons, including the calculations the government used to arrive at the amount of the benefit reduction, is constitutionally required in a case such as this one. *Dilda v. Quern*, 612 F.2d 1055, 1056–57 (7th Cir.) (per curiam), *cert. denied*, 447 U.S. 935, 100 S.Ct. 3039, 65 L.Ed.2d 1130 (1980); *Banks v. Trainor*, 525 F.2d 837, 842 (7th Cir.1975), *cert. denied*, 424 U.S. 978, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976); *Vargas v. Trainor*, 508 F.2d 485, 489 (7th Cir.1974), *cert. denied*, 420 U.S. 1008, 95 S.Ct. 1454, 43 L.Ed.2d 767 (1975). Other judges in this district have cited the Seventh Circuit cases approvingly. *Hill v. O'Bannon*, 554 F.Supp. 190, 197 (E.D.Pa. 1982) (burden should not be placed on recipients to contact caseworkers to find out why aid was being cut, citing *Vargas v. Trainor, supra* ); *Philadelphia Welfare Rights Organization v. O'Bannon*, 525 F.Supp. 1055, 1060–61 (E.D.Pa.1981) (notice deemed constitutionally inadequate because it did not state reasons for cutback in benefits, citing *Banks v. Trainor, supra*, and *Vargas v. Trainor, supra* ). Defendants concede that they do not meet the standard which these cases impose, arguing that the proper standard is much less severe.

There is a good deal of uncertainty about just what information the state must provide in notices of benefit reductions. Courts often conclude that some kind of statement of reasons is necessary. *See, e.g., LeBeau v. Spirito*, 703 F.2d 639, 643–44 (1st Cir.1983); *Garrett v. Puett*, 557 F.Supp. 9, 14 (M.D.Tenn.1982), *affirmed*, 707 F.2d 930 (6th Cir.1983); *Willis v. Lascaris*, 499 F.Supp. 749, 757 (N.D.N.Y.1980). When one examines the cases, however, it quickly becomes clear that the word "reasons" covers a very wide territory indeed. In *Garrett v. Puett, supra*, for example, the court upheld the use of notices which did little more than recite the fact that a "new federal law" had changed the way in which the recipient's income had to be calculated. *See* 557 F.Supp. at 11–12. Such cases stand in sharp contrast to the Seventh Circuit cases cited above, which require the state to give the recipient the worksheets on which the state's calculations were made. *See Dilda v. Quern, supra*. In this case, the parties argue chiefly about whether the state must, as the Seventh Circuit would require, include in the notice the calculations by which it arrived at the amount of the overpayment.

The presence or absence of a detailed statement of reasons, with attendant calculations, is not before me now. The issue before me is whether there is a reasonable probability that the notices used in this case did not allow recipients to prepare adequately for their hearings. That question is necessarily somewhat context-specific: the nature of the government action, the educational level of the affected parties, and the practicality of various alternatives are all relevant to the question whether a given notice was sufficient for constitutional purposes. *See Memphis Light, supra*, 436 U.S. at 14–15 n. 15, 98 S.Ct. at 1562–1563 n. 15. At the very least, however, a recipient must know how to obtain the information he needs to challenge the state's decision in order to prepare for his hearing. I find that the letters used here fail to meet even this minimum standard. The third letter states that the recipient can "meet with the Claim Settlement staff to discuss the matter informally or to present information which might change the proposed action." Read in light of the first and second letters, that statement seems to invite the informal presentation of the *recipient's* evidence, not the provision to the recipient of the *government's* evidence or calculations. Absent some sort of offer to provide the data on which the state relied—and easy access to the source of that data—the notices here provide a statement of a proposed government action that may be incomprehensible to affected parties, with no explanation and no self-evi-

dent way to get one. Along these same lines, I note that the third letter invites phone calls to the Claim Settlement staff as a means of setting up a meeting, perhaps implying that information will not be freely given over the phone. To poor and poorly educated recipients, this presents an important and unnecessary obstacle to obtaining needed information.

An invitation to seek information is, of course, valueless unless that information is in fact readily available. Defendants argue that information is available to anyone who calls the toll-free number listed in the notices, but testimony taken at the hearing suggested that only the most persistent recipients would reach anyone at the other end of the toll-free number.[6] Moreover, there was testimony that the information available to those who got through was sketchy, because the personnel on the other end had only incomplete access to the recipient's file. Finding this testimony credible, I cannot conclude that the necessary information was available to recipients in this case.

My conclusion makes it unnecessary for me to decide whether a detailed statement of reasons, of the sort plaintiffs seek, is constitutionally required in this case.[7] At this stage, I hold only that, on the record before me, there appears a substantial probability that plaintiffs will be able to show that the notice employed by the state does not allow recipients to pursue their hearing rights in a meaningful way.

### B. *Irreparable Harm*

■ The parties devote undue space in their briefs to arguing about the degree of harm plaintiffs in this case will suffer if wrongfully deprived of 10% of their benefit checks for the duration of this litigation. It is established that such harm is both irreparable and substantial. *See, e.g., Philadelphia Welfare Rights Organization v. O'Bannon*, 525 F.Supp. 1055, 1058–59 (E.D.Pa.1981). Because I have now held that plaintiffs have shown a probability of success on the merits, such harm suffices for purposes of issuing a preliminary injunction.

### C. *Harm to the State and the Public Interest*

There is unquestionably a cost to the state in ceasing recoupment of overpay-

---

6. Defendants argue that the fact that the toll-free number has fielded some 1200 calls, an indeterminate number of which concerned overpayments, establishes that the toll-free number is a "significant source of information" for recipients. Defendants' Supplemental Brief at 3. The number of calls does not, however, establish the nature of the information provided recipients.

Moreover, it is not enough for defendants to show that some lucky recipients were able to obtain the information they needed in order to challenge the state's decision. Rather, the state has the burden of providing effective notice to *all* those who are deprived of "property" within the meaning of the Fourteenth Amendment. *Mennonite Board of Missions v. Adams*, 462 U.S. 791, 103 S.Ct. 2706, 2712, 77 L.Ed.2d 180 (1983). And the testimony at the hearing suggested that while some recipients get through on the toll-free number, other frustrated callers get no information at all.

7. Any other conclusion would necessarily stray beyond the issues presented by plaintiff's motion. Plaintiffs argue that a statement of reasons which includes the state's calculations is the only way in which the state can give recipi-

ents the information they must have to prepare for their hearings. I am not presented, however, with a case in which the state has gone as far as possible in providing notice short of a detailed statement of reasons. I cannot conclude that some intermediate alternative does not adequately notify recipients when no such intermediate alternative is before me. Nor is it clear that the Constitution requires a detailed and individualized statement of reasons. *Memphis Light* supports no such inference; indeed, the Court suggested that it would suffice if the municipal utility involved in that case offered to provide the necessary information upon request in a manner convenient for consumers. 436 U.S. at 14–15 n. 15, 98 S.Ct. at 1562–1563 n. 15. Moreover, there is authority for the proposition that this flexibility extends to the welfare context; that, in other words, notice that allows for a meaningful hearing process suffices even if no detailed written statement of reasons is provided. *See Wilson v. Heckler*, 580 F.Supp. 1387, 1393 (D.D.C.1984); *Garrett v. Puett*, 557 F.Supp. 9 (M.D.Tenn.1982), *affirmed*, 707 F.2d 930 (6th Cir.1983). It would be inappropriate for me to address such an unsettled and difficult constitutional question when the decision on the motion before me does not require it.

ments as to those individuals who received improper notice. That cost does not, however, loom large in this case. The parties agree that the recipients whose benefits have been cut under the recoupment program number in the hundreds. And, as defendants argue in minimizing the potential harm of erroneous cuts to plaintiffs, the dollar amounts involved here are not great.

 The remaining factor in my preliminary injunction determination is the public interest. Plaintiffs and defendants disagree on the proper definition of the public interest, plaintiffs stressing the importance of providing for those in need, defendants emphasizing the strong policy in recovering

money due the state. Both these positions ignore the strong interest in following constitutional procedures, which themselves balance the private and state interests at stake. Thus, for purposes of deciding plaintiff's motion for a preliminary injunction, I find the public interest coextensive with the merits determination.

## IV. CONCLUSION

For the foregoing reasons, I have determined that plaintiffs' motion for class certification should be granted, and plaintiffs' motion for preliminary injunctive relief should be granted insofar as the relief sought is consistent with the views expressed in this Memorandum.

APPENDIX A

NOTICE FOR RECOUPMENT OF
CASH ASSISTANCE OVERPAYMENT

Commonwealth of Pennsylvania
Department of Public Welfare
BUREAU OF CLAIM SETTLEMENT
P.O. BOX 8016
Harrisburg, PA 17105
Toll Free Number 1–800–932–0935

YOUR CASE NUMBER
Co Record Number Cat GG Ctr Dig Dist

DATE OF
NOTICE

CASH OVER
PAYMENT

CASH OVER
PAYMENT
PERIOD

PERSON WHO CAUSED THE OVERPAYMENT

The County Assistance Office has notified us that the family group for which you are the payment name received cash assistance for which they were not eligible. The person causing the overpayment is shown above. You must repay the Department of Public Welfare the entire amounts of all overpayments shown above.

You must repay the entire amount of your CASH OVERPAYMENT to the Department of Public Welfare by choosing A, B or C listed below. If you do not choose one of these three, Option C will apply. The monthly recoupment amount will be 10 percent of the Assistance payment a family group would receive if that family group had no other income.

It is very important that you answer this notice within fourteen (14) calendar days of the date shown in the upper right section. If you do not return the bottom portion of this notice, Claim Settlement will use Option C automatically. If you feel that the above information is incorrect or if you have any question, our toll free number is 1–800–932–0935.

In the bottom portion please check the space that shows how you wish to pay this CASH claim. Mail the bottom portion and your check or money order to the address below. Please make your check or money order payable to PA DEPARTMENT OF PUBLIC WELFARE.

YOUR CASE NUMBER
Co Record Number Cat GG Ctr Dig Dist

CHECK ONE CHOICE OF REPAYMENT AND MAIL BACK THIS PART TO: Department of Public Welfare, Bureau of Claim Settlement, P.O. BOX 8016, PA 17105.

Please make your check or money order payable to the PA Department of Public Welfare.

A._____I am enclosing the full amount of the cash claim.

B._____I am enclosing $_____ and agree to repay the rest of the cash claim by reductions in my semi-monthly assistance checks.

C._____I agree to pay the full amount of the cash claim by reductions in my semi-monthly assistance checks.

If you do not check one of the above, Claim Settlement will use Option C automatically. You will have the opportunity to request an appeal and to have a fair hearing before your assistance check is reduced.

cs 76—4–83

## APPENDIX B

NOTICE OF AMOUNT OF GRANT REDUCTION

Commonwealth of Pennsylvania
Department of Public Welfare
BUREAU OF CLAIM SETTLEMENT
P.O. BOX 8016
Harrisburg, Pennsylvania 17105
Toll Free Number 1–800–932–0935

YOUR CASE NUMBER
Co Record Number Cat GG Ctr Dig Dist

AMOUNT OF CLAIM

AMOUNT OF SEMI-
MONTHLY GRANT
REDUCTION

NUMBER OF CHECKS
TO BE REDUCED

DATE OF NOTICE

We sent you a notice on about an overpayment of cash assistance. The balance of the claim shown above must be paid to the Department of Public Welfare. Your check will be reduced semi-monthly by the amount shown above until the claim is paid in full. The final semi-monthly grant reduction will be adjusted to complete the repayment in the exact amount.

Shortly you will receive an advance notice that your check will be reduced. The advance notice form will inform you of the semi-monthly recoupment amount and the date of the check that grant reduction will begin. When you receive the advance notice form, you have the right to request an appeal and a fair hearing.

cs 77—4–83

APPENDIX C

ADVANCE NOTICE

Commonwealth of Pennsylvania
Department of Public Welfare
BUREAU OF CLAIM SETTLEMENT
P.O. BOX 8016
Harrisburg, Pennsylvania 17105
Toll Free Number 1–800–932–0935

YOUR CASE NUMBER
Co Record Number Cat GG Ctr Dig Dist

DATE OF NOTICE

### YOU HAVE RECEIVED TWO PRIOR NOTICES FROM US ABOUT THIS ACTION.

This is to notify you that your check of will be reduced by $ to repay a cash assistance overpayment in the amount of $ . This overpayment occurred from to
This grant reduction will continue until the overpayment is completely repaid.

We plan to take this action to comply with the recoupment provisions in the Omnibus Budget Reconciliation Act of 1981 (P.L. 97–35) and Act 75–1982. The regulations implementing the recoupment provisions of these laws are in 55 PA Code 255.4(e). Recoupment means that your assistance check will be reduced to repay a prior overpayment. You will continue to remain eligible for Medical Assistance if recoupment reduces your assistance check to zero.

### YOUR RIGHT TO APPEAL AND TO A FAIR HEARING

If you disagree with our decision, you have the right to appeal and a fair hearing.

If your oral request for a hearing is received in the Office of Hearings and Appeals or your written request is postmarked before _____ we will not act to begin recoupment pending the hearing decision.

At the hearing you can present to the Hearing Officer the reasons why you think the decision of the Bureau of Claim Settlement is incorrect and present evidence or witnesses in your own behalf. You have the right to represent yourself or to have an attorney represent you. If you cannot afford an attorney, free legal help may be available at your local legal services office. You can obtain the address and telephone number of your local legal services office by calling the Lawyer Referral Service listed in the phone book's yellow pages or by calling toll free 1–800–932–0935.

If you and your representative would like to meet with Claim Settlement staff to discuss the matter informally or to present information which might change the proposed action, please call Claim Settlement at the toll free number listed above. This will not delay or replace your fair hearing.

---

YOUR CASE NUMBER
Co Record Number Cat GG Ctr Dig Dist
HOW TO REQUEST A FAIR HEARING
To request a fair hearing you must comply with the following:
(1) You may make an oral request by calling the Office of Hearings and Appeals at their toll free number 1–800–932–0935.
(2) You must sign and complete one copy of this form
 Please state the reason for your appeal,
 Please indicate your telephone number,
 Please indicate your exact address, and
(3) You must mail this form to the Office of Hearings and Appeals, P.O. BOX 8326, Harrisburg, PA 17105.

I WANT TO REQUEST A HEARING BECAUSE:

| Date | Client Representative | Telephone | Date | Client Signature | Telephone |
|------|----------------------|-----------|------|------------------|-----------|

| Address | Address |
|---------|---------|

cs 78—4–83